UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CURTIS P. BUSSE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:12-CV-827 (CEJ) |
| | ) |
| CAROLYN W. COLVIN, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant.[1] | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.  Procedural History

On November 10, 2008, plaintiff Curtis Busse filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et. seq.*, (Tr. 22-224), with an alleged onset date of March 6, 2007. After plaintiff's application was denied on initial consideration (Tr. 158-162), he requested a hearing from an Administrative Law Judge (ALJ). See Tr. 167-173 (acknowledging request for hearing).

Plaintiff and counsel appeared for a hearing on February 16, 2010. (Tr. 96-148). A supplemental hearing (Tr. 199-206) was held on December 20, 2010. (Tr. 28-95). The ALJ issued a decision on January 10, 2011 denying plaintiff's application. (Tr. 9-20), and the Appeals Council denied plaintiff's request for review on March 6, 2012. (Tr. 1-5). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and should be substituted for Michael J. Astrue as the defendant in this suit.  No further action need to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

## II.  Evidence Before the ALJ

### A.  Disability Application Documents

In his Disability Report (Tr. 239-247), plaintiff listed his disabling conditions as attention deficit disorder (ADD), depression, sleep apnea, allergies, high blood pressure, and acid reflux. He stated that he cannot comprehend new material or focus. Plaintiff listed his past employment as accountant and branch manager/regional trainer of an extermination company.

A Third Party Function Report (Tr. 249-257) was completed by plaintiff's wife, Christy Busse. She listed plaintiff's daily activities as eating, cleaning the house, caring for their children, and using the computer. She described plaintiff as the main caregiver for their children and stated that he feeds, bathes, and takes them to school. She claimed that plaintiff can no longer hold long conversations, sleep soundly, or complete tasks. She wrote that plaintiff's conditions do not affect his ability to maintain his own personal or grooming needs and that he does not need reminders to take medicine. She stated that plaintiff prepares his own meals on a daily basis and that he is able to do laundry, clean dishes and floors, dust, and mow the lawn.  She estimated that he spends two to three hours each day performing household chores.

Mrs. Busse wrote that plaintiff goes outside on a daily basis, drives a vehicle, and can grocery shop, although it takes him longer to shop without a list. Plaintiff is able to pay bills, count change, handle a savings account, and use a checkbook. She wrote that plaintiff's hobbies include coins, stamps, and watching television, but that he can no longer concentrate on the coins and stamps. She stated that plaintiff speaks with his mother on a daily basis, but that his family frustrates him because they do not

-2-

understand his issues. She wrote that prior to his condition he was a very social person, but is now reluctant to go outside and tends to avoid contact with people.

Mrs. Busse claimed that plaintiff's conditions affect his ability to understand, talk, follow instructions, see, complete tasks, get along with others, concentrate, remember, frame thoughts into coherent sentences, hear with background noise, pay attention for more than five minutes, and read small print. She wrote that plaintiff can walk two to three miles before needing a rest. She claimed that plaintiff gets along well with authority figures, but that he had previously quit a job because he could not get along with a supervisor. She stated that plaintiff is more easily agitated, confused, less focused, and handles stress poorly.

## B.  Hearing on February 16, 2010

At the time of the hearing, plaintiff was 48 years old, 6'3" tall, and weighed 387 pounds. (Tr. 101, 112). He had been married for 15 years and lived in a house with his wife and three children, ages eight, six, and four. (Tr. 110, 140).  Plaintiff completed two years of college, studying finance and accounting. (Tr. 101). After attending school, plaintiff joined the army reserves where he worked as a tanker, infantry, and drill sergeant. (Tr. 101-102).

Plaintiff testified that in 1992 he began working at an extermination company as a commercial technician; he was later promoted to service manager and then branch manager. (Tr. 105-106). At one point, plaintiff earned an annual salary of $61,000. (Tr. 106). In 2001, plaintiff left the company because of excessive work hours and the time it kept him away from his wife. (Tr. 107). Plaintiff testified to working as an accountant from 2001 to 2007. (Tr. 108). Plaintiff explained that he left

-3-

that job because he was having difficulties focusing and that his "work was [] going downhill quick[.]" (Tr. 109).

Plaintiff testified that his disabling conditions primarily consist of mental health issues and sleep apnea, but he expressed doubt in his ability to stand for eight hours. (Tr. 111-112). Plaintiff stated that he was diagnosed with attention deficit disorder (ADD) in 2005 and depression, but felt that he was not depressed. (Tr. 113-115). At the time of the hearing plaintiff took 40mg of Lexapro[2] daily. (Tr. 115). Plaintiff testified that he does not like to go out in public. (Tr. 117-118).

Plaintiff stated that in 2009 he underwent a sleep study, which resulted in replacing his CPAP[3] device with a BIPAP device.[4] However, at the time of the hearing, he had yet to make the switch. He testified to taking Ambien.[5] (Tr. 118-119, 122). Plaintiff claimed that he sleeps until 10:00 a.m. or 12:00 p.m. when his wife is home from work and can take care of their children. (Tr. 120). Plaintiff claims that he takes two-hour naps almost every day and uses his CPAP device two or three times a day if he does not nap. (Tr. 127).

_____

[2] Lexapro, or Escitalopram, is used to treat depression and generalized anxiety disorder.   http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html   (last visited on Mar. 11, 2013).

[3] CPAP, or continuous positive airway pressure, is a treatment that uses mild air pressure to keep the airways open. CPAP can be used to treat sleep apnea. http://www.nhlbi.nih.gov/health/health-topics/topics/cpap/ (last visited Nov. 13, 2012).

[4] BIPAP, or biphasic positive airway pressure, is a treatment that uses pressure controlled ventilation allowing unrestricted spontaneous breathing at any moment of the ventilatory cycle. http://www.ncbi.nlm.nih.gov/pubmed/8143712 (last visited Mar. 13, 2013).

[5] Ambien is indicated for the short-term treatment of insomnia characterized by difficulties with sleep initiation. http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=77119 (last visited Mar. 11, 2013).

-4-

Plaintiff testified that he was diagnosed with diabetes in 2009, which is controlled by diet and medication. Plaintiff stated that he also takes medication for acid reflux and high blood pressure and that he does not experience side effects from any of his medications. (Tr. 122). Plaintiff testified that in December 2009 his energy level was getting better, but that he has difficulty helping his children with their homework because of problems maintaining concentration. (Tr. 121-123).

Plaintiff testified that he no longer takes medication for ADD because it interfered with his sleep. (Tr. 124). Plaintiff further testified that a month and a half prior to the hearing his treating physician advised him to find a psychiatrist. Plaintiff explained that he could not find a psychiatrist because they generally do not treat adult patients with ADD. Plaintiff claimed that his physician advised him to lie and say he needed help for depression, but he stated that he did not feel comfortable lying. (Tr. 115-116, 125).

Brenda G. Young, M.A., a vocational expert, provided testimony regarding plaintiff's past work and current employment opportunities. (Tr. 130-138). The ALJ asked Ms. Young to list plaintiff's vocational history and classify each position. Ms. Young listed bank account clerk as sedentary, semi-skilled; branch manager at an extermination company as light, skilled; and commercial technician as heavy, semi-skilled. (Tr. 130-131). Ms. Young testified that plaintiff's transferable job skills include keeping accurate records, performing mathematical computations, and directing the work of others. (Tr. 131).

The ALJ asked whether a 45 year old individual with plaintiff's education and past work experience, who had no exertional limitations, but required a low stress job with only occasional decision-making or occasional changes in work setting, would be

-5-

able to perform plaintiff's past relevant work. (Tr. 131). The vocational expert answered in the negative, but stated that there would be other available jobs in the regional and national economy, including retail sales (light, unskilled work of which there are 40,000 jobs in the St. Louis area), hand packer or packager (medium, unskilled work of which there are 9,000 jobs in the St. Louis area), and laundry or dry-cleaning jobs (medium, unskilled work of which there are 3,500 jobs in the St. Louis area). (Tr. 132).

The ALJ then asked whether an additional limitation requiring simple, routine, and repetitive tasks would eliminate any of the aforementioned employment opportunities. Ms. Young answered that there would be a possibility that the individual would not be able to perform the retail sales position. (Tr. 132-133). Ms. Young stated that if the individual was limited to occasional interaction with the public, the retail sales position would definitely be eliminated. Ms. Young further testified that if the individual was unable to meet competitive standards for pace and production all employment opportunities in the regional or national economy would be eliminated. (Tr. 133).

Plaintiff's attorney then asked Ms. Young whether a 45 year old individual with plaintiff's past work experience who had no ability or poor ability to deal with the public, relate to coworkers, interact with supervisors, deal with work stress, and relate predictably in social situations would be able to work. Ms. Young answered in the negative. Ms. Young also confirmed that if the individual had no ability or poor ability to maintain attention and concentration, the individual would also be precluded from employment. (Tr. 133-134).

-6-

The ALJ reexamined Ms. Young and asked whether a 45 year old individual with plaintiff's education and past work experience, who was limited to simple, routine,  and repetitive tasks and who also needed to work in a low stress environment with no decision making, occasional changes in work setting, and occasional interaction with the public and coworkers, could work in the jobs previously listed. Ms. Young stated that the individual could work in all jobs except retail sales. (Tr. 136).

Plaintiff's attorney then called Mrs. Busse to testify. (Tr. 140-146). Mrs. Busse testified that plaintiff is incapable of focusing, concentrating, and thinking on his own, but can follow very simple explicit directions. (Tr. 141). Mrs. Busse testified that plaintiff tends to wander around their home because he cannot remember what he was planning to do. (Tr. 142). She stated that she tried to help him find a psychiatrist, but that she either does not receive return phone calls or is told that the office does not treat adult ADD. She testified that plaintiff's sleep apnea makes it difficult for him to wake up in the morning. (Tr. 143). Mrs. Busse testified that the CPAP used to help, but that the sleep apnea has gotten worse. She claimed that she trusts plaintiff with their children and does not feel that he would forget about them and leave them somewhere. (Tr. 146).

### C. Supplemental Hearing on December 20, 2010

The ALJ asked plaintiff if he had experienced any changes since the last hearing. Plaintiff stated that he had to stop coaching his daughter's sports teams because he had difficulties articulating instructions. (Tr. 33-35). Plaintiff testified that he switched to the BIPAP, but he wakes up feeling physically exhausted and naps for several hours each day. (Tr. 35-36, 45). Plaintiff stated that he still had not found a psychiatrist for the same reason as before and because of the cost of co-pays. (Tr. 37-38). Plaintiff

testified that he was still taking medication for depression, sleep apnea, acid reflux, and high blood pressure. (Tr. 38). Plaintiff stated that he looked into working at a convenience store, but decided against it because he would have to stand for an eight-hour shift and was concerned about his ability to count change. (Tr. 42, 91). Plaintiff did not have any concerns about missing work or being late as long as the BIPAP did not keep him from hearing his alarm clock. (Tr. 92). Plaintiff testified that he considered starting a t-shirt and bumper sticker business in 2009, but that it never came to fruition. (Tr. 47-49).

At the time of the supplemental hearing plaintiff weighed around 400 pounds. (Tr. 43). Plaintiff stated that it had been three weeks since he went to a grocery store because it took him four hours to retrieve twelve items the last time he tried to shop. (Tr. 47-49).

The ALJ proceeded to take testimony from James D. Reid, Ph.D., a medical expert and clinical psychologist. Dr. Reid summarized the medical records for the ALJ. (Tr. 50-52). Dr. Reid commented on how he was surprised that the medical source statements "described plaintiff as having poor to none on a host of activities, [because] there [was] no corresponding documenting empirical evidence to support those conclusions, particularly since the [general physician's] chart itself describe[d] the depression as moderate." (Tr. 50). Dr. Reid expressed his belief that plaintiff had anxiety and personality disorders. (Tr. 50-52). Dr. Reid testified that plaintiff's depressed mood, dysphoric affect and feelings of helplessness, worthlessness, and low self esteem were more consistent with dysthymic disorder or low-level depression. (Tr. 60).

-8-

The ALJ asked Dr. Reid to explain the disconnect between the normal results from the cognitive functioning and memory tests and plaintiff's complaints of memory and concentration problems. Dr. Reid testified that he could not explain it, but that it seemed as if plaintiff possessed some sort of passive-aggressive personality disorder. (Tr. 53-54).

The ALJ asked Dr. Reid if he thought plaintiff could work in a situation where he would have to handle simple, routine tasks on a continuous, repetitive basis. Dr. Reid answered that he could not imagine that plaintiff could not perform simple, routine tasks. Dr. Reid also testified that he believed plaintiff could handle stress in a work setting occasionally up to one-third of the day. (Tr. 63-64). Dr. Reid further expressed surprise that plaintiff could no longer perform his past work even with his current diagnosis. (Tr. 67). Dr. Reid stated that he was unsure of the source of plaintiff's lack of motivation as he finds it to be "missing and [] unexplained in this record and testimony."

In response to questioning by plaintiff's attorney, Dr. Reid testified that any differences between the residual functional capacity (RFC) determinations in the record could be attributed to the fact that one doctor accounted for all of plaintiff's impairments while the other doctor based the evaluation solely on plaintiff's psychiatric issues. (Tr. 69).

Plaintiff was then asked to answer a few more questions. Plaintiff testified that when he said he was coaching his daughter's teams, he really meant that he "was basically there as an adult . . . it really wasn't coaching." (Tr. 72). His roles required him to sit on a bench, tell the girls to drink water, stand at third base, or demonstrate how to dribble and free throw. (Tr. 74). He stated that he used to coach one to two

hours a week. (Tr. 75). Plaintiff testified that his mental health was getting worse in that he had lower motivation and difficulty performing small tasks, such as filling out a form prior to the hearing. (Tr. 80). Plaintiff stated that his limitations mostly derive from sleep apnea. (Tr. 81).

The ALJ referred to a May 5, 2010 psychological evaluation and asked plaintiff how he was able to perform well on a two-hour cognitive functioning test but had difficulty completing a form. (Tr. 81-82). Plaintiff explained that when he cannot sleep he has better focus despite being exhausted. Plaintiff also stated it seemed that the doctor didn't care about administering the test. This made plaintiff angry, which increased his adrenalin and helped him perform better. (Tr. 82-83).

The ALJ again questioned vocational expert Brenda Young, who testified at the prior hearing. (Tr. 84-91). The ALJ reviewed Ms. Young's prior testimony and she stated that she would not change any of her answers. (Tr. 86). The ALJ asked whether a younger individual with the same education and work experience as plaintiff who had no exertional limitations, but was limited to simple and routine tasks, required a low-stress environment with only occasional decision-making or occasional changes in the work setting and occasional interaction with the public, coworkers, and supervisors, could perform any of plaintiff's past relevant work. Ms. Young answered in the negative, but stated that the individual could work as a stocker (of which there are 21,000 jobs in the St. Louis area), a hand packager (of which there are 9,000 jobs in the St. Louis area), or a file clerk (of which there are 2,000 jobs in the St. Louis area). (Tr. 87-88)

The ALJ asked Ms. Young whether the same employment opportunities would be available if the individual was limited to no decision-making. Ms. Young answered

that the individual would still be able to perform all three positions. (Tr. 88). However, if the individual was unable to meet competitive standards for pace and production or required daily two-hour naps, all employment opportunities would be eliminated. (Tr. 89-90). Ms. Young further testified that if the ALJ accepted all of the limitations listed in the November 15, 2010 RFC determination, the individual would be precluded from the work previously listed. (Tr. 90).

## D. Medical Evidence

From August 22, 2007 to June 11, 2008, plaintiff had five office visits with Lorinna Shniter, M.D. for complaints unrelated to his alleged disabilities. (Tr. 425-434). Dr. Shniter's office notes identified depression as a chronic problem and described it as moderate. On November 14, 2008, Dr. Shniter wrote a letter confirming that plaintiff was diagnosed with ADD in the summer of 2005 and was prescribed Concerta.[6] (Tr. 435).

On January 29, 2009, Terry Dunn, Ph.D., completed a psychiatric review. (Tr. 508-516). Dr. Dunn expressed his opinion that plaintiff did not have any episodes of decompensation, but did possess mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 516). Dr. Dunn found plaintiff's allegations of depression to be credible, but "[o]verall, the totality of medical evidence indicates [plaintiff's] impairments are non-severe." (Tr. 518).

On January 30, 2009, medical consultant, Paul Calvert completed a physical RFC assessment for plaintiff. (Tr. 152-157). Mr. Calvert concluded that plaintiff's

---

[6] Concerta is a stimulant for the treatment of attention deficit hyperactivity disorder. http://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=1a88218c-5b18-4220-8f56-526de1a276cd (last visited Mar. 22, 2013).

impairments impact his ability to perform work related activities and that he should be limited to light work. Mr. Calvert indicated on a checklist form that plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds; stand, walk, or sit for a total of about 6 hours in an 8-hour workday; and occasionally climb, balance, stoop, kneel, crouch, or crawl. Mr. Calvert did not note any manipulative, visual, or environmental limitations.

On June 13, 2009, William Kuntz, M.S., LCSW, a licensed psychologist, performed a psychological evaluation. (Tr. 441-454). Mr. Kuntz wrote that plaintiff's "prognosis is generally quite good because he sees himself as being responsible for his difficulties and is willing to examine his behavior." Mr. Kuntz suggested cognitive behavioral psychotherapy and antidepressant medication if the severity of his depression increased. Mr. Kuntz diagnosed plaintiff with major depressive disorder, social phobia, and attention deficit disorder (predominantly inattentive type). (Tr. 454).

On five occasions, from July 15, 2009 to September 23, 2009, plaintiff visited with Mr. Kuntz at the New Beginnings Counseling Center. (Tr. 479-480). Plaintiff complained that he felt out of control, useless, and cowardly. Plaintiff stated that he was sleeping better overall, but was still feeling tired. Plaintiff also stated he was not sure whether he procrastinates because of "a lack of motivation or laziness." (Tr. 480).

On November 9, 2009, Dr. Shniter completed a mental medical assessment of plaintiff's ability to do work-related activities. She expressed the opinion that plaintiff would have a good[7] ability to follow work rules and a fair[8] ability to use judgment, function independently, understand, remember, and carry out simple job instructions

---

[7] "Good" is defined as "ability to function is limited but satisfactory."

[8] "Fair" is defined as "ability to function is seriously limited, but not precluded."

if written down, maintain personal appearance, behave in an emotionally stable manner, and demonstrate reliability. However, she opined that plaintiff would have a poor[9] ability to relate with co-workers, deal with the public, interact with supervisors, deal with work stress, maintain attention or concentration, understand, remember, and carry out complex and/or detailed instructions, and relate predictably in social situations. Dr. Shniter wrote that plaintiff has a history of sleep apnea, is extremely tired all the time, and that he has a lack of motivation, depressed mood, an inability to concentrate, a fair intellectual ability, a poor memory, fair comprehension, and difficulties with thoughts. (Tr. 455-456).

On the same day, Dr. Shniter also performed a physical exam. She once again described plaintiff's depression as moderate. She found plaintiff to be positive for fatigue and malaise. She described plaintiff as morbidly obese. (Tr.461-463). On November 13, 2009 and November 25, 2009, plaintiff returned to see Dr. Shniter. The treatment notes do not indicate what plaintiff's complaints were or the purpose for the visits. (Tr. 457-458).

On November 24, 2009, a sleep study was performed at Midwest Sleep Diagnostics, that resulted in a diagnosis of obstructive sleep apnea. (Tr. 465-466). Upon request from the diagnostic facility, Dr. Shniter signed a prescription for a heated humidifier and a mask with headgear. (Tr. 465).

On December 2, 2009, Mr. Kuntz completed a medical assessment form evaluating plaintiff's ability to do work-related activities. (Tr. 467-468). Mr. Kuntz's opinion was based on a clinical interview and psychological testing. Mr. Kuntz wrote that plaintiff met the criteria for major depression, social phobia, and attention-deficit

---

[9] "Poor" is defined as "no useful ability to function."

hyperactivity disorder (ADHD). He expressed his opinion that plaintiff would be good at functioning independently and fair at following work rules, dealing with the public, maintaining personal appearance, behaving in an emotionally stable manner, demonstrating reliability, and understanding, remembering, and carrying out simple job instructions. Mr. Kuntz felt that plaintiff would be poor at dealing with work stresses, maintaining attention or concentration, relating predictably in social situations, understanding, remembering, and carrying out complex and/or detailed job instructions. Mr. Kuntz left blank his opinion on how plaintiff would relate to co-workers, use judgment, and interact with supervisors. Mr. Kuntz wrote that plaintiff suffers from impaired memory functioning due to anxiety and depression and that his social phobia and depressed mood impair his social functioning.

On December 18, 2009, plaintiff saw Erin Holloway, ANP, at the Kirkwood Medical Group for a diabetes follow up. (Tr. 469-471). Plaintiff complained of increased fatigue, dyspnea, diarrhea, and hypoglycemic episodes. Plaintiff was diagnosed with non insulin dependant diabetes mellitus and was provided with information about blood glucose monitoring, medication, and diet. Ms. Holloway instructed plaintiff to lose 40 pounds within four to six months. She discussed the importance of portion sizes, increasing water and fiber intake, decreasing caloric intake, and being active.

On January 4, 2010, Dr. Shniter described plaintiff as very obese, positive for fatigue, and listed moderate depression as chronic problem. An x-ray of the abdomen indicated a nonspecific bowel gas pattern with no free intraperitoneal air. (Tr. 472-474, 478). On January 20, 2010, plaintiff saw Dr. Shniter for a diabetes follow-up. She wrote that plaintiff was negative for fatigue, noted an improvement in energy levels, and ordered an electrocardiogram and a cardiovascular stress test. (Tr. 475-477). Both

-14-

tests results were within the normal range. (Tr. 507). On February 24, 2010, Dr. Shniter saw plaintiff for allergies. Dr. Shniter wrote that four to five months prior, plaintiff had discontinued the use of Singulair and an antihistamine which had controlled his allergies. Plaintiff again denied fatigue. (Tr. 496-498).

On May 10, 2010, F. Timothy Leonberger, Ph.D., clinical neuropsychologist, performed a psychological evaluation based on a clinical interview, a review of the records, observation, the Wechsler Memory Scale-Revised, and an MMPI-2. (Tr. 481-486). Dr. Leonberger described plaintiff as awake, alert, and oriented with logical and sequential thinking. Plaintiff scored within the average range for working and immediate memory, auditory concentration and memory, and mental manipulation of well-known variables. On a visual concentration task, plaintiff obtained a superior score. Plaintiff was found to be in the low average to average range for visual memory subtests. Dr. Leonberger wrote that he was "unconvinced" that plaintiff had ADHD and explained that "[w]hen it was first diagnosed, it was likely that he was experiencing sleep apnea, which likely led to poor concentration/attention during the day[,]" or negative side effects from the medications he was taking at the time. (Tr. 484). Dr. Leonberger further wrote that plaintiff was "clearly [] experiencing an anxiety disorder, which makes attention/concentration in social situations very problematic." (Tr. 485). Dr. Leonberger found plaintiff to have no impairments in daily living and moderate impairments in social functioning, concentration, persistence, pace, and deterioration or decompensation in work or work-like settings. (Tr. 485).

Dr. Leonberger also completed a medical source statement. (Tr.487-489). He expressed his opinion that plaintiff's impairments imposed no restrictions in his ability

-15-

to understand and remember simple instructions; mild[10] restrictions in his ability to carry out simple instructions, understand and remember complex instructions, make judgments on complex work-related decisions, and respond appropriately to usual work situations or changes in a routine work setting; and moderate[11] restrictions in his ability to make judgments on simple work-related decisions, carry out complex instructions, and interact appropriately with the public, supervisors, and co-workers. Dr. Leonberger wrote that "much of his anxiety is exacerbated by intense emotional and interpersonal encounters." (Tr. 488).

On September 9, 2010, plaintiff saw Dr. Shniter for a follow-up appointment concerning his diabetes and hypertension. (Tr. 501-503). Dr. Shniter wrote that he had no symptoms associated with either condition, that his diabetes was managed with diet, oral medications and finger-stick blood sugar monitoring, and that he was negative for fatigue. (Tr. 501-502). On November 15, 2010, Dr. Shniter stated that her opinions regarding plaintiff's conditions remained constant and that the November 9, 2009 mental assessment was still accurate. (Tr. 490).

On February 18, 2011, Michael V. Oliveri, Ph.D., completed a neuropsychological evaluation based on a clinical interview, formal neuropsychological testing, and a review of the record. (Tr. 519-522). A neurobehavioral status exam revealed normal orientation and focused attention. (Tr. 521). Dr. Oliveri found plaintiff to have a normal neurocognitive profile and dysthymic disorder. He wrote that somatoform features, with over-focus and hypersensitivity to self-perceived cognitive problems, was not

---

[10] "Mild" is defined as a "slight limitation in this area, but the individual can generally function well."

[11] "Moderate" is defined as "more than a slight limitation in this area, but the individual is still able to function satisfactorily."

-16-

supported by objective cognitive testing. Dr. Oliveri found that plaintiff's results were not consistent with ADD. He suspected that "plaintiff will require longstanding treatment for chronic depression, including supportive care" and that his "level of mood disturbance argues for significant limitations in his capacity to function in a competitive work-like setting." (Tr. 522).

On April 1, 2011, Shazia Malik, M.D., completed a mental medical assessment of plaintiff's ability to do work-related activities. (Tr. 527-528). Dr. Malik stated that plaintiff would be fair in using judgment, functioning independently, understanding, remembering, and carrying out simple instructions. However, she claimed that plaintiff would be poor in every other activity relating to occupational performance and personal-social adjustments.

### D. Employment Evidence

On January 23, 2007, Sandra Baylor, plaintiff's manager at Citi Mortgage, completed a performance appraisal. (Tr. 284-333). The rating categories available were exceptional,[12] highly effective,[13] effective,[14] partially effective,[15] and not effective.[16] (Tr. 287). Plaintiff was found to be effective in employing systems for controlling, monitoring, and following up on work and commitments, maintaining

---

[12] "Exceptional" is defined as "performance that consistently sets new standards and is truly exemplary."

[13] "Highly effective" is defined as "performance that is consistently strong and at times exemplary."

[14] "Effective" is defined as "performance that is consistently strong."

[15] "Partially effective" is defined as "performance that needs some improvement."

[16] "Not effective" is defined as "performance that is unsatisfactory and needs considerable improvement."

acceptable appearance, exhibiting good communication skills by expressing ideas and opinions logically and concisely, being absent or tardy, offering new ideas or trying new approaches to a task, identifying situations that require the attention of a supervisor, and maintaining an acceptable work area. Plaintiff was found to be partially effective in supporting co-workers and being flexible with regard to work assignments. Plaintiff was found to be not effective in demonstrating an open mind to the opinions of others, exhibiting courteous behavior, maintaining an efficient and professional manner during times of increased pressure, working effectively without hands-on supervision, and demonstrating creative problem solving. (Tr. 284-332).

Ms. Baylor wrote that plaintiff did not maintain a good working relationship with account managers, did not react well to constructive criticism, provided incorrect information, had an increased error rate during times of increased workloads, sent incorrect emails, had a lack of attention to important details, and did not demonstrate creative problem solving. She rated him effective in following up on outstanding items and wrote that he did not mind sharing his knowledge with others.  The overall employee rating was described as "marginal/below standard." Ms. Baylor noted that plaintiff refused to sign the performance review. (Tr. 293).

### III.  The ALJ's Decision

In the decision issued on January 10, 2011, the ALJ made the following findings:

1.    Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2012.

2.    Plaintiff has not engaged in substantial gainful activity since March 6, 2007, the alleged onset date.

3.    Plaintiff has the following severe impairments: a dysthymic disorder and generalized anxiety disorder.

4.    Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    Plaintiff has the residual functional capacity (RFC) to perform a full range of work at all exertional levels but is limited to simple, routine, and repetitive one or two step tasks in a low stress environment defined as only occasional decision making and only occasional changes in the work setting.

6.    Plaintiff is unable to perform any past relevant work.

7.    Plaintiff was born on January 17, 1962 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability date.

8.    Plaintiff has a high school education with at least two years of college and is able to communicate in English.

9.    Plaintiff has acquired work skills from past relevant work.

10.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is "not disabled," whether or not the claimant has transferable job skills.

11.   Considering plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform.

12.   Plaintiff has not been under a disability, as defined in the Social Security Act, from March 6, 2007, through the date of this decision.

(Tr. 9-20).

## IV.  Legal Standards

The district court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240

F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect

-20-

his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The

burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

### V.  Discussion

Plaintiff contends that the ALJ erred by (1) failing to properly analyze plaintiff's obesity and sleep apnea; (2) failing to properly analyze plaintiff's mental impairments; (3) failing to give sufficient weight to Dr. Shniter and Mr. Kuntz; and (4) failing to properly assess plaintiff's credibility. (Doc. #20).

### A. Obesity and Sleep Apnea

The ALJ determined that plaintiff has the RFC to perform a full range of work at all exertional levels, but is limited to simple, routine, and repetitive one-  or two-step tasks in a low stress environment, defined as only occasional decision making and only occasional changes in the work setting. Plaintiff contends that these are not appropriate limitations because the ALJ failed to properly analyze his sleep apnea and obesity. Plaintiff specifically argues that the ALJ failed to consider his extreme fatigue and necessity to nap daily.

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted); 20 C.F.R. § 404.1545(a)(1). It is the claimant's burden, rather than the Commissioner's to prove claimant's RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). However, even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)); see also Dykes v. Apfel, 223 F.3d 665, 666 (8th Cir. 2000) (RFC is a determination based on all the record evidence, not only the medical evidence).

The Court finds that the ALJ properly analyzed plaintiff's sleep apnea. The ALJ acknowledged the 2009 medical source statement written by Dr. Shniter, which attributed plaintiff's poor ability to relate to coworkers, deal with the public, interact with supervisors, deal with work stress, and maintain attention and concentration, to a history of sleep apnea. (Tr. 14). The ALJ referred to Dr. Leonberger's report which stated that plaintiff's persistence and pace was affected by poor sleep. The ALJ also acknowledged that plaintiff testified to waking up tired and taking daily two-hour naps. Although there are other references to plaintiff's sleep apnea in the record, the ALJ is not required to discuss every piece of evidence in his decision, and the failure to cite specific evidence does not indicate that such evidence was not considered. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (citations omitted). The ALJ then concluded

-23-

that plaintiff's sleep apnea appeared controlled with the BIPAP machine and noted that the "evidence of record is devoid of any specific work-related limitations as a result of [sleep apnea]." (Tr. 12).

The Court finds that the ALJ's conclusions regarding plaintiff's sleep apnea are supported by substantial medical and record evidence. Mr. Kuntz wrote in his July 29, 2009 counseling notes that plaintiff was "sleeping better overall, but still felt tired." (Tr. 479). Plaintiff testified that in December 2009 he experienced an increase in energy and a decrease in fatigue, but claimed that it was "very short-lived." (Tr. 121). Dr. Shniter's January 20, 2010 treatment notes record plaintiff's report of increased energy. (Tr. 476). However, Dr. Shniter's treatment notes from February 24, 2010 and September 9, 2010 do not reflect that the improvement was short-lived, since both records definitively state that plaintiff was "negative for fatigue." (Tr. 497, 501). On May 10, 2010, Dr. Leonberger described plaintiff as "awake" and "alert." (Tr. 483). Furthermore, plaintiff testified that despite feeling exhausted, he focuses better when he does not sleep well. (Tr. 82-83). The Court also notes that none of plaintiff's treating or consultative physicians indicated any medical requirement for plaintiff to take naps throughout the day. In fact, plaintiff was instructed to "increase [his] activity level." (Tr. 471).

Plaintiff argues that the ALJ's reliance on the fact that he prepares his children's lunches, takes them to school, and previously coached his daughter's sports teams is not an appropriate means of gauging the disabling effect of his sleep apnea. The Court disagrees. Evidence showing that plaintiff is the "main caregiver" of his children along with testimony supporting plaintiff's ability to do various activities weighs against finding that sleep apnea is a severe disability. See Debord v. SSA, No. 4:12-CV-219

-24-

(Mo. E.D. Feb. 26, 2013) (consideration of a plaintiff's daily activities can help show functional ability). Also, this evidence was only one factor in the ALJ's decision and not the sole factor. Accordingly, the ALJ did not err in his discussion of plaintiff's sleep apnea.

The Court also finds that the ALJ properly analyzed plaintiff's obesity and that his conclusions are appropriately supported by substantial medical and record evidence. The ALJ acknowledged that plaintiff was obese with a height of 75 inches and a weight of 387 pounds, but that he worked for many years at this weight without difficulty. See Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) (plaintiff continuing to work with impairments demonstrated that impairments were not disabling). The ALJ further noted that plaintiff did not testify that his weight created any specific work-related limitations. The ALJ accurately wrote that "[n]o doctor who treated or examined [plaintiff] . . . placed any specific long-term limitations on [his] abilities to stand, sit, walk, bend, lift, carry, or do other basic exertional activities." (Tr. 16). The ALJ also noted that the medical records did not establish any "inability to ambulate effectively or to perform fine and gross movements effectively on a sustained basis due to any underlying musculoskeletal impairment." (Tr. 17). The ALJ also observed that plaintiff seemed to have no difficulties in ambulating or moving during the hearing. (Tr. 17); see Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008) (An ALJ can include his own observations of the claimant as one of several factors).

Additionally, plaintiff did not cite obesity as a disabling condition in his disability report and did not comply with medical instructions that he lose 10% of his body weight. The Eighth Circuit has held that an ALJ does not need to discuss obesity in the decision when a physician has not placed physical limitations on the plaintiff's ability

-25-

to perform work-related functions and when obesity is not cited as a physical limitation in plaintiff's function report or testimony. McNamara v. Astrue, 590 F.3d 607, 611 (8th Cir. 2010). Furthermore, plaintiff's wife wrote in her third-party function report that plaintiff could walk two to three miles without needing a rest. (Tr. 240, 254, 469-471). Accordingly, the ALJ did not err in his discussion of plaintiff's obesity.

## B. Mental Impairments

Plaintiff contends that the ALJ failed to properly analyze his mental health issues. The ALJ found that plaintiff suffers from a severe impairment of dysthymic disorder[17] and generalized anxiety disorder. (Tr. 11). The ALJ accounted for these impairments by finding that plaintiff has the RFC to perform "simple, routine, and repetitive one or two step tasks in a low stress environment defined as only occasional decision making and only occasional changes in the work setting." (Tr. 13). In arriving at this conclusion, the ALJ discussed the findings of Dr. Shniter, Mr. Kuntz, Dr. Leonberger, and Dr. Reid.

The ALJ considered Dr. Shniter's medical source statement in which she wrote that plaintiff had "poor or no ability to relate to coworkers, deal with the public, interact with supervisors, deal with work stress, and maintain attention and concentration." (Tr. 14). However, Dr. Shniter attributed these issues to a history of sleep apnea, not mental impairments. Dr. Shniter also stated that plaintiff lacked an ability to perform daily chores due to fatigue, lack of motivation, depressed mood, and an inability to concentrate. However, the ALJ noted that the limitations listed by Dr. Shniter were

---

[17] Dysthymia is a chronic type of depression in which a person's moods are regularly low. However, symptoms are not as severe as with major depression. http://www.nlm.nih.gov/medlineplus/ency/article/000918.htm (last visited Apr. 4, 2013).

contrary to plaintiff's own testimony of his abilities and daily activities. Furthermore, Dr. Shniter's medical opinions in the source statement were contrary to her treatment notes, which consistently referred to plaintiff's depression as "moderate." See Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005) (ALJ may give less weight to a treating physician when the physician's own opinions are inconsistent).

The ALJ considered Mr. Kuntz's December 2009 medical source statement, including his opinion that plaintiff suffered from major depressive disorder, social phobia, and ADHD. However, the ALJ also noted that plaintiff voluntarily stopped visiting Mr. Kuntz after five counseling sessions, was never hospitalized for his mental impairments, and failed to find a psychiatrist after being advised to do by Dr. Shniter. The Eighth Circuit has held that an ALJ appropriately found depression to be non-disabling when there is an absence of ongoing treatment. Holland v. Apfel, 153 F.3d 620, 622 (8th Cir. 1998); Gwathney v. Charter, 104 F.3d 1043, 1045 (8th Cir. 1997).

Plaintiff claimed that he could not find a psychiatrist because most do not treat adult ADD/ADHD and because he did not want to lie about needing treatment for depression. The plaintiff's statements about depression can best be characterized as inconsistent. In his Disability Report, plaintiff claimed that depression was one of the impairments that limited his ability to work (Tr. 240), yet he subsequently testified that he did not feel that he was depressed and did not want to see a psychiatrist for depression. (Tr. 113-16, 125). Additionally, the treatment provided for plaintiff's mental impairments can be described as conservative, which consisted solely of medication prescribed by his primary care physician. See Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (conservative treatment of a patient can qualify as substantial evidence to support an ALJ's decision against a disability).

The ALJ summarized Dr. Leonberger's psychological evaluation. Plaintiff was given a Global Assessment of Functioning (GAF) of 60,[18] was found to have only mild limitations in functioning, no limitations in daily living, and moderate limitations in social functioning. Dr. Leonberger stated that plaintiff's average to above average testing scores demonstrated no specific signs of ADHD, but that his persistence and pace were affected by anxiety and poor sleep. Dr. Leonberger expressed the opinion that claimaint was capable of maintaining unskilled jobs and diagnosed him with generalized anxiety disorder and dysthymic disorder.

The ALJ also included a portion of Dr. Reid's testimony in his decision. Dr. Reid believed that plaintiff suffered from some form of depressive and personality disorder. Dr. Reid testified that he agreed with Dr. Leonberger's assessment over Mr. Kuntz. Dr. Reid also commented on how he was surprised that the medical source statements "described plaintiff as having poor to none on a host of activities, [because] there [was] no corresponding documenting empirical evidence to support those conclusions, particularly since the [general physician's] chart itself describe[d] the depression as moderate." (Tr. 50). Dr. Reid further expressed that he was surprised that plaintiff could no longer perform his past work even with his current diagnosis. (Tr. 67). Dr. Reid stated that he was unsure of the source of plaintiff's lack of motivation and found it to be unexplained in the record.

After reviewing the medical evidence and the ALJ's decision, the Court finds that the ALJ did not err in his analysis of plaintiff's mental impairments. The ALJ's RFC,

---

[18] A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (E.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

which does include an accommodation for plaintiff's mental disabilities, is supported by substantial evidence on the record as a whole.

### C. Opinions of Dr. Shniter and Mr. Kuntz

The opinion of a treating physician is generally entitled to substantial weight, while the opinion of a consulting physician generally receives little weight. Casey v. Astrue, 503 F.3d 687, 691 (8th Cir. 2007); Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). An ALJ may reject an opinion from a treating or consultative physician that is inconsistent with the record. Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005).

The record contains Dr. Shniter's treatment notes from August 22, 2007 to November 15, 2010. Dr. Shniter consistently described plaintiff's depression as a "moderate" chronic issue. None of Dr. Shniter's notes include a discussion of plaintiff's symptoms, limitations, or descriptions regarding his depression or concentration issues. She does not record any of plaintiff's complaints regarding depression or any issues or benefits from the prescription medication used to treat his depression. In fact, none of the treatment notes state that plaintiff sought an appointment for his depression or ADHD. Instead, plaintiff's "chief complaints/reasons for visit" typically involved a follow up for his diabetes.  The only time Dr. Shniter weighed in on plaintiff's mental impairments was in her completion of a two-page pre-printed medical assessment questionnaire, in which she describes plaintiff's depression and concentration issues as severe conditions that impose major limitations on his ability to do work-related activities.

-29-

"The ALJ may credit other medical evaluations over the opinion of a treating physician . . . when the treating physician's opinions are internally consistent." Morris v. Astrue, No. 4:12-CV-189 (E.D. Mo. March 28, 2013) (citing Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005); see Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."). Furthermore, an ALJ is not obligated to follow the opinion of a treating physician when that opinion is not corroborated with treatment notes or consists of conclusory statements. Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010); Clevenger v. S.S.A., 567 F.3d 971, 975 (8th Cir. 2009).  A treating physician's opinion can be discounted when the medical source statement limitations were never mentioned in treatment records. Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995). Dr. Shniter's opinions in her medical source statement were inconsistent and unsupported by her treatment records and consisted solely of conclusory statements. Accordingly, the ALJ properly attributed less weight to Dr. Shniter's opinions regarding plaintiff's mental impairments.

Furthermore, "the ALJ may credit other medical evaluations over the opinion of a treating physician if the other assessments are supported by better or more thorough medical evidence[.]" Morris v. Astrue, No. 4:12-CV-189 (E.D. Mo. March 28, 2013). Although Dr. Leonberger was a consultive examiner, his assessment was supported by thorough medical evidence, unlike the unfounded and explained answers provided in the form filled out by Dr. Shniter. Dr. Leonberger performed an extensive interview, review of plaintiff's medical records, mental status examination, and various tests, including the Wechsler Memory Scale and the MMPI-2. Plaintiff tested average or above average on the vast majority of the tests.

The Court also finds that the ALJ did not err when he gave less weight to the opinion of Mr. Kuntz. The record reflects that plaintiff first saw Mr. Kuntz on June 13, 2009 for a psychological examination. Mr. Kuntz concluded that plaintiff's prognosis was generally quite good and that antidepressants might be needed if his depression becomes more severe. Plaintiff saw Mr. Kuntz five times between June 15, 2009 and September 23, 2009. The counseling notes in the record are extremely brief and mostly consist of plaintiff's subjective complaints. On December 2, 2009, two months after plaintiff's last visit, Mr. Kuntz completed a brief two-page medical assessment of plaintiff's ability to work. Mr. Kuntz, indicated in the checklist-type questionnaire, that plaintiff was seriously limited in various activities with no useful ability to function in other areas.

The ALJ explained that he gave less weight to Mr. Kuntz's opinion because he only saw plaintiff for a few months in the summer of 2009. "Generally, the longer a treating source has treated [plaintiff] and the more times [plaintiff has] been seen by a treating source, the more weight [] will be give[n] to the source's medical opinion." See 20 C.F.R. § 494.1527(d)(2)(1). Their four-month relationship, consisting of five visits, is a sufficient reason for the ALJ to attribute less weight to Mr. Kuntz's medical opinions.

## D. Plaintiff's Credibility

Plaintiff's final argument is that the ALJ erred in evaluating his credibility. "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Holstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001). "In order to assess a claimant's subjective complaints, the ALJ must make a credibility determination by considering the claimant's daily activities; duration, frequency, and intensity of the

-31-

[alleged impairment]; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions." Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The ALJ is not required to discuss methodically each [] consideration, so long as he acknowledged and examined those considerations before discounting [a claimant's] subjective complaints." Partee v. Astrue, 638 F.3d 860, 865 (8th Cir. 2011). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination." Juszcyzk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008).

The ALJ took note of the fact that plaintiff testified to pursuing employment after his alleged onset date of disability. Looking for or considering employment while allegedly disabled is an activity that is inconsistent with an inability to work. See Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995). Plaintiff is also able to complete many of the ordinary activities of daily living, including paying bills, banking, cooking, cleaning, using the computer, watching television, and taking care of his children. Significant daily activities may be inconsistent with claims of a disability. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). Furthermore, plaintiff testified that he was not seeing a doctor for his mental health problems. A plaintiff's failure to pursue regular medical treatment detracts from credibility. See Edwards v. Barnhart, 314 F.3d 964, 968 (8th Cir. 2003).

"An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole." Van Vickle v. Astrue, 539 F.3d 825, 828 (8th Cir. 2008). When the record does not reflect physician imposed restrictions, an inference can be made that a plaintiff's restrictions in daily activities are self-imposed

rather than a medical necessity. See Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004). Because the record lacks any physician instruction for him to nap or rest daily, the ALJ appropriately inferred that his restrictions regarding daily activities are by choice.  The ALJ also noted that plaintiff does not suffer from any adverse medication side effects, which is supported by the medical record.

The Court finds that the ALJ's credibility finding is supported by good reasons. See Juszcyzk, 542 F.3d 626.  Accordingly, the ALJ did not err in his analyzing plaintiff's credibility.

## VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his brief in support of complaint [Doc. #20] is **denied**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of July, 2013.

-33-